IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELIA GERALDI, | ) | CASE NO. 5:16CV823 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Angelia Geraldi ("Geraldi") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 12.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Geraldi protectively filed an application for DIB and SSI on October 5, 2012, alleging a

disability onset date of October 2, 2012.  Tr. 132, 341.  She alleged disability based on the

following: herniated disc in lumbar spine, asthma, diabetes, pinched nerve in her back, anxiety

and neuropathy.  Tr. 345.  After denials by the state agency initially (Tr. 208, 209) and on

reconsideration (Tr. 242, 243), Geraldi requested an administrative hearing.  Tr. 278.  A hearing

was held before Administrative Law Judge ("ALJ") Eric Westley on August 26, 2014.  Tr. 151-

179.  In his September 5, 2014, decision (Tr. 132-145), the ALJ determined that Geraldi could

perform her past relevant work and  that there were jobs in the national economy that she could

perform, i.e., she was not disabled.  Tr. 144.  Geraldi requested review of the ALJ's decision by

the Appeals Council (Tr. 128) and, on February 8, 2016, the Appeals Council denied review,

making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Geraldi was born in 1969 and was 43 years old on the date her application was filed.  Tr.

341.  She completed high school and has a college degree in medical assisting and phlebotomy.

Tr. 158.  She last worked in October 2012 as a caregiver in a group home.   Tr. 158-159.

Previously she worked as a caregiver for a family friend, a registration clerk, a phlebotomist, a

veterinarian technician and a pharmacy technician.  Tr. 161.

### B.  Relevant Medical Evidence[1]

Geraldi began seeing Ibrahim Bshara, M.D., for low back pain in July 2006.  Tr. 426.

On September 6, 2012, Geraldi had a bone scan after complaining of joint pain.  Tr. 428.

The bone scan revealed a mild degenerative change in her right patellofemoral (knee) joint and

was otherwise unremarkable.  Tr. 428.  On September 20, 2012, she had an MRI of her lumbar

spine after she complained of low back pain radiating into her pelvis, hips and legs and

numbness in her extremities.  Tr. 488.  The MRI showed a mild degree of spinal stenosis at the

L4-5 level due to a broad-based disc bulge posteriorly, mild hypertrophy of the ligamentum

flavum, and mild facet arthrosis and hypertrophy predominantly on the left side.  Tr. 488.  X-rays

of Geraldi's right knee taken the same day showed mild degenerative change.  Tr. 491-492.

---

[1]  Geraldi did not challenge the ALJ's findings regarding her mental impairments.  Accordingly, only the medical
evidence relating to Geraldi's challenged physical impairment is summarized and discussed herein.

From October 5 to October 9, 2012, Geraldi was admitted to Fairview Hospital after complaining of severe back pain in her lumbar spine that radiated to her right anterior thigh.  Tr. 521.  She reported having back pain for the last five years.  Tr. 521.  She had aggravated her back at work the previous week while helping to move a heavy patient.  Tr. 521.  Her pain was worse with movement and sleeping on her back.  Tr. 521.  She denied leg weakness or band-like pain.  Tr. 521.  Dr. Bshara had given her an increased dose of Vicodin but it had not helped her pain and he advised she go to the hospital.  Tr. 521.  Doctors reviewed her September 2012 lumbar MRI and interpreted it as showing a normal lumbar spine with "some minor bulging disk."  Tr. 520.

A follow-up MRI of her lumbar spine taken on October 6, 2012, revealed degenerative changes most severe at L4-L5 and L5-S1.  Tr. 532.  She had bulging discs resulting in mild central canal narrowing, mild neural foramina narrowing, and facet hypertrophy resulting in contact with traversing S1 nerve roots.  Tr. 532.  She was evaluated by Emad Daoud, Ph.D., of pain management, who found that Geraldi's current pain was not controlled even with opioid therapy.  Tr. 527.  Upon exam, she had normal muscle strength, sensation and reflexes.  Tr. 527.  She had "questionable" bilateral straight leg testing.  Tr. 527.  She was prescribed steroids and diagnosed with lumbosacral spondylosis without myelopathy, lumbar disc degeneration, migraine, spinal stenosis, morbid obesity, diabetes, asthma, dysthymic disorder, leukocytosis, and tobacco use.  Tr. 520.   She was discharged and scheduled for an epidural injection the next day.  Tr. 520.

On October 10, 2012, Geraldi received an L4-L5 interlaminar epidural steroid injection from Joseph Abdelmalak, M.D.  Tr. 554.

On October 13, 2012, Geraldi saw Dr. Bshara for a follow-up.  Tr. 436.  She complained of low back pain and muscle aches.  Tr. 435.  Upon exam, she exhibited no abnormal spinal curvatures and had intact motor and sensory function, reflexes and gait.  Tr. 436.  Dr. Bshara prescribed Percocet on an as-needed basis for her pain.  Tr. 436.  He explained to Geraldi that she needed to lose weight or else her pain would get worse.  Tr. 436.

Geraldi returned to Dr. Bshara on October 25, 2012.  Tr. 459.  Her pain was improved "but not completely the same."  Tr. 459.  Upon exam, she was in no apparent distress but exhibited pain with range of motion of her low back and a slow, shuffling gait.  Tr. 430.  She was moderately obese at a weight of 270 pounds.  Tr. 430.  Dr. Bshara refilled Geraldi's prescription of Percocet.  Tr. 459.  The next day,  Dr. Abdelmalak gave her a left L5-S1 and S1 transforaminal epidural steroid injection.  Tr. 500.

On February 22, 2013, Geraldi returned to the Fairview Hospital emergency department complaining of dizzy spells, tremors, and joint pain.  Tr. 634.  She had pain in her knees, shoulders, low back and feet; she also stated that she had neuropathy.  Tr. 634.  She had not been taking her medications, except for her diabetes medication, because she could not afford it.  Tr. 634.  She ran out of her Percocet two weeks prior.  Tr. 637.  Upon examination, she had no tenderness and she was able to ambulate on her own.  Tr. 637.  Her medical note reads, "Patient is insistent that she is unable to walk, however she is able to walk she has walked to the bathroom and walked down the hall. She does this slowly, but without assistance."  Tr. 637.  She requested narcotic pain medication but medical staff would not prescribe it for a number of reasons, including because she had already received a prescription for narcotics in the past 30 days.  Tr. 638.  She declined the staff's offer of Vicodin.  Tr. 638.  Dr. Bshara was contacted and instructed Geraldi to follow up with him.  Tr. 638.

On April 16, 2013, Geraldi visited the Parma Community General Hospital complaining of migraines.  Tr. 683.  She denied pain anywhere else but her head.  Tr. 683.  She stated that she had been under a lot of stress lately, including having a very ill family member at Metro Hospital, and "[s]he is hoping to get something very quickly for her headache so she can go over to Metro."  Tr. 683.  Upon examination, she had full strength in her extremities, intact sensation, normal reflexes and a normal gait.  Tr. 683.

 On November 11, 2013, Geraldi went to Parma Community General Hospital after injuring herself when she was at a restaurant and a chair collapsed under her.  Tr. 688.  She described "left-sided buttocks pelvic area pain" made worse when she sat on that area.  Tr. 688.  She denied any hip, knee, ankle or foot pain.  Tr. 688.  Upon examination, she walked with a mild level of antalgia, had left-sided paraspinous and SI joint tenderness when palpated, had a limited range of motion in her lumbar spine, intact strength in her extremities, and trace reflexes at her knees and ankles.  Tr. 688.

On May 6, 2013, Geraldi saw Charles Koepke, M.D.  Tr. 614.  These notes are difficult to read, but it appears as though Dr. Koepke diagnosed fibromyalgia and anxiety and prescribed medication.  Tr. 614.  On June 6, 2013, Geraldi reported that she could barely walk the prior week.  Tr. 613.  Dr. Koepke opined that she likely needed chronic pain management, referred her to "ortho," and prescribed medication.  Tr. 618.

On September 24, 2013, Geraldi complained to Dr. Koepke of difficulty walking and that her right knee was giving out.  Tr. 616.  She had multiple tender points and Dr. Koepke remarked that she had not seen pain management or "ortho" and prescribed medication.  Tr. 616.  Geraldi saw Dr. Koepke on November 19, 2013, for a follow-up for back pain after she had had a fall on November 10, 2013.  Tr. 615.  X-rays of her lumbar spine showed mild degenerative changes

and no fracture or dislocation.  Tr. 619.  Dr. Koepke remarked that Geraldi had still not seen pain management or "ortho" yet.  Tr. 615.  Dr. Koepke diagnosed a strain and contusion and prescribed medication.  Tr. 615.

On May 21, 2014, Geraldi saw Dr. Koepke for a check-up for her back and leg pain.  Tr. 625.  Upon exam, she had multiple tender points.  Tr. 625.  Dr. Koepke "again urged [her] to see chronic pain [management], ortho" and prescribed medication.  Tr. 625.

On June 24, 2014, Geraldi began treating at MetroHealth and saw Paula Finton, M.D.  Tr. 708.  Upon exam, she had normal reflexes, intact sensation in her extremities, no motor deficits and a normal gait.  Tr. 710.  She had tenderness to palpation in her lumbar spinal and paraspinal regions and a reduced range of motion.  Tr. 710.  She was diagnosed with diabetes, neuropathy, low back pain, anxiety and depression, asthma, and obesity.  Tr. 710-711.

On July 10, 2014, Geraldi saw Yashar Eshraghi, M.D, for pain management upon referral from Dr. Koepke.  Tr. 719.  Geraldi reported that she had tried physical therapy and epidurals but continued to have pain.  Tr. 720.  Her duration for standing, sitting, and walking was unremarkable.  Tr. 720.  Upon exam, she had moderately painful flexion, extension and rotation of her lumbar spine.  Tr. 720.  Motor strength, sensation, and reflexes in her extremities were normal, her fine motor coordination was normal, and her gait was normal.  Tr. 723.  She was diagnosed with low back pain, depressive disorder, neuropathy, fibromyalgia and migraines.  Tr. 723.  Dr. Eshraghi recommended pool therapy, weight control, and an epidural injection.  Tr. 724.

On July 25, 2014, Geraldi received a bilateral L5-S1 lumbar transforaminal epidural steroid injection.  Tr. 730.

On August 5, 2014, Geraldi returned to pain management complaining of lower back pain radiating to her right leg that was crampy, sharp, dull, intermittent, and burning.  Tr. 737. She reported that the epidural injection she received on July 25 did not help at all.  Tr. 737. Percocet helped "somewhat."  Tr. 737.  Upon exam, Todd Markowski, CNP, found Geraldi to have tenderness to palpation in her lumbar spine, bilateral SI joints and hips.  Tr. 738.  She had normal reflexes and sensation, normal motor strength in her extremities, and she walked with the assistance of a walker.  Tr. 738.  Markowski added Mobic to Geraldi's prescribed pain medication regimen, refilled her Percocet, and, if the new medication was not effective, planned to take another MRI and consult a neurosurgeon.  Tr. 739.

## C.  Medical Opinion Evidence

### 1.  Treating physician

On March 9, 2013, Dr. Bshara completed a medical source statement on behalf of Geraldi.  Tr. 611-612.  He limited Geraldi to lifting and carrying ten pounds due to her lower back pain, standing/walking a half-hour at a time up to three hours total due to her herniated disc, and sitting one hour at a time up to three hours total.  Tr. 611.  He limited her to rare postural changes; rare reaching, pushing, pulling and fine manipulation; and occasional gross manipulation.  Tr. 611-612.  He also opined that Geraldi would need to elevate her legs at will to 45 degrees and to take extra breaks and that Geraldi's severe pain interferes with her concentration, takes her off task, and causes absenteeism.  Tr. 612.

### 2.  State agency reviewers

On December 19, 2012, state agency physician Diane Manos, M.D., reviewed Geraldi's record.  Tr. 187-190.  Regarding Geraldi's residual functional capacity ("RFC"), Dr. Manos

opined that Geraldi can perform light work with occasional postural limitations and without concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  Tr. 188-189.

On May 9, 2013, Lynne Torello, M.D., reviewed Geraldi's file and adopted Dr. Mano's opinion.  Tr. 219-220.

**D.  New Evidence provided to the Appeals Council**

On February 18, 2015, more than five months after the ALJ's decision, Geraldi submitted additional medical evidence to the Appeals Council.  Tr. 7.  The Appeals Council found that the medical records related to a later period of time and, therefore, did not affect the ALJ's decision as to whether Geraldi was disabled on or before September 5, 2014.  Tr. 2.  The pertinent records are as follows:

On October 9, 2014, Geraldi continued to report back pain to Markowski.  Tr. 9.  She was taking Percocet and Mobic and reported that the Mobic did not help but the Percocet reduced her pain level from a 10 to a 7.  Tr. 9-10.  Upon examination, she had a rest tremor in her right arm, walked with a walker, and had tenderness to palpation in her lumbar spine, SI joints and hips.  Tr. 10-11.  She had full motor strength, normal sensation and normal reflexes in her extremities.  Tr. 11.

On October 27, 2014, an MRI of Giraldi's lumbar spine showed an annular tear at L4-5 resulting in mild canal stenosis, severe left facet arthropathy, moderate right facet arthropathy, and multilevel spondylosis.  Tr. 18.

On November 6, 2014, Geraldi reported that Percocet reduced her pain from a 10 to an 8 but she did not feel it was helping enough.  Tr. 54.  Upon exam, she had full muscle strength, intact reflexes and intact sensation.  Tr. 56.  She had tenderness to palpation in her lumbar spine,

SI joints and hips.  Tr. 56.  Markowski started her on MS Contin and instructed Geraldi to follow up in one month to reassess.  Tr. 56.

On November 11, 2014, Geraldi attended a neurosurgery consultation with Bulent Yapicliar, M.D.  Tr. 77.  She reported that her back and leg pain had gotten worse over the past few months.  Tr. 77.  Upon examination, Geraldi had normal motor strength, normal muscle tone, and normal reflexes in her extremities.  Tr. 77.  Dr. Yapicliar reviewed Geraldi's lumbar MRI and interpreted the results as "grossly normal."  Tr. 77.

On December 4, 2014, Geraldi reported to Markowski that, since her last visit, she had gradually worsened.  Tr. 82.   Her pain was sharp and continuous with no attendant weakness in her arms and legs and she had numbness and tingling down her left leg.  Tr. 82.  She reported that her Percocet and MS Contin took her pain from a 9 to a 7.  Tr. 82.  Markowski noted that she had seen a surgeon and was not a candidate for surgery.  Tr. 82.  Her physical exam findings were unchanged from her last visit.  Tr. 84.

On December 31, 2014, Geraldi complained of neck pain on the right side of her spine.  Tr. 92.  She stated that she did not believe her pain medications were helping much.  Tr. 92.  An x-ray of her cervical spine was normal.  Tr. 100.  Her physical examination findings remained unchanged since her prior visit.  Tr. 94.

On January 14, 2015, Geraldi reported that her pain had "rapidly worsened."  Tr. 115.  She had pain in her whole neck and right arm and she was dropping things; she was staying in bed and using a walker to ambulate.  Tr. 115.  Upon exam, she had tenderness to palpation over her paraspinal muscles in the reportedly painful areas.  Tr. 118.

**E.  Testimonial Evidence**

    **1.  Geraldi's Testimony**

Geraldi was represented by counsel and testified at the administrative hearing. Tr. 153-173. She testified that she left her last job as a caregiver for cerebral palsy patients because of physical pain and explained that it was a "very physical job." Tr. 159. By the time she got home from work in the evenings, she could barely walk up the three steps to get into her house. Tr. 150. She had been having a lot of pain, called her doctor, and was admitted to the hospital. Tr. 159. She was hospitalized for four days and could not return to work. Tr. 159. She does not feel she can work because she has a lot of physical limitations such as bending and standing for more than ten minutes. Tr. 161. She has "very bad" neuropathy in her feet and her herniated discs press on her sciatica nerve on both sides and there is no position that alleviates her pain, such as lying down, sitting up or leaning back. Tr. 161. She has received more than a dozen epidural blocks but they have not helped her. Tr. 161-162. The last one was a month prior after her new doctor decided to try the injection from a different angle on both sides of her back, but that did not help either. Tr. 162. The ALJ asked why, if the injections did not help her, she continued to receive them, and Geraldi stated that she had not gone back to her new doctor and that "they said something about maybe trying some kind of an infusion of medication." Tr. 162.

Geraldi takes several different medications for neuropathy and pain and an antidepressant which is supposed to help her pain also, but she doesn't get much pain relief. Tr. 162. She has been on pain medication for a long time due to surgeries and procedures over the years and she has developed a very high tolerance for pain medication. Tr. 162. It has been difficult for her to get pain medication now because "they're being so scrutinized" and she does not know what else to do. Tr. 163. She has tried physical therapy three times; the last time was earlier in the year after a fall. Tr. 163. She cannot stand TENS units because she finds them to be very painful. Tr. 163.

Geraldi stated that she was diagnosed with fibromyalgia the previous year. Tr. 163. She has days when "every inch of me hurts, and even my skin hurts." Tr. 163. She also has diabetes and she takes insulin. Tr. 164. She stated that she is unable to do things that she used to do before, like go to Cedar Point, because she "can't do that walking, and that standing." Tr. 167. She has had a walker since the previous year when Dr. Koepke wrote her a prescription for one. Tr. 167. When asked if she uses the walker for balance so she does not fall, Geraldi replied, "I have a lot of pain in my feet also, not just my back and my legs because of the neuropathy." Tr. 168. She cannot wear closed shoes on her feet because the neuropathy causes an intense feeling of burning, like she is walking on hot coals. Tr. 168. She also loses her balance a lot. Tr. 168. For example, she will be walking and her knee will give out; she may get a sharp pain in a butt cheek and it causes her knees to buckle. Tr. 168. She does not use the walker in the house because she can hold on to things in the house. Tr. 168.

Geraldi takes Neurontin for her neuropathy and Flexeril for muscle cramps in her toes, arches of her feet, calves, shin and her back. Tr. 169. Dr. Bshara recommended that she elevate her legs to take pressure off her lower back; she does this a couple of times a day, but it makes the neuropathy in her feet worse. Tr. 179. She does not sleep well in part because her pain makes it difficult to get comfortable. Tr. 170.

### 2. Vocational Expert's Testimony

Vocational Expert Deborah Lee ("VE") testified at the hearing. Tr. 170-178. The ALJ discussed with the VE Geraldi's past relevant work as a caregiver/nurse assistant, phlebotomist, registration clerk and veterinarian technician. Tr. 172. The ALJ asked the VE to determine whether a hypothetical individual of Geraldi's age, education and work experience could perform her past work if the individual had the following characteristics: can lift or carry twenty

pounds occasionally and ten pounds frequently; can stand or walk six hours out of an eight-hour day; sit for six hours out of an eight-hour day; occasionally climb ramps, stairs, ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; must avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation; can perform tasks in a setting that is close to home; and can perform goal-oriented work but not at a production rate pace.  Tr. 173-174.  The VE answered that such an individual could perform Geraldi's prior job of registration clerk, but that she had no idea if the location of this job was close to Geraldi's home.  Tr. 174.  The ALJ asked how she would factor in the close-to-home requirement and the VE stated that she would look at a person's geographic location and then figure out if there was a particular radius in which they were looking for a job.  Tr. 174.  The ALJ asked if the individual described could perform any other jobs and the VE stated that such an individual could perform the following jobs: sales clerk with stores being relatively close to most people's homes (4,340,000 national jobs, 150,000 Ohio jobs, 5,200 regional jobs); cashier, generally a position close to an urban center (1,300,000 national jobs, 50,000 Ohio jobs, 21,000 regional jobs); and fast food worker (1,147,000 national jobs, 55,000 Ohio jobs, 31,000 regional jobs).  Tr. 174-175.

Next, the ALJ asked if such an individual could still perform Geraldi's past work or any other work if the individual was limited to sedentary work.  Tr. 175.  The VE answered that such an individual could still perform Geraldi's past work as a registration clerk and could also perform work as a receptionist (789,000 national jobs, 20,000 Ohio jobs, 7,500 regional jobs); appointment clerk  (120,000 national jobs, 4,000 Ohio jobs, 1,100 regional jobs); and telephone solicitor (110,000 national jobs, 9,600 Ohio jobs, 3,000 regional jobs).  Tr. 175-176.  The ALJ asked the VE if an individual could perform Geraldi's past work or any other work if that

individual would be off-task for 20% of the time and the VE replied that it would be problematic for such an individual.  Tr. 177.

Geraldi's attorney asked the VE whether a hypothetical individual could perform work if the individual could perform sedentary work but with a sit/stand option at will and could rarely stoop, crouch, kneel, crawl, reach in any direction, and push and pull, in addition to the mental limitations described in the ALJ's first hypothetical.  Tr. 177.  The VE answered that such an individual would not be able to perform any work because of the reaching limitation.  Tr. 178.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a

13

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his September 5, 2014, decision, the ALJ made the following findings:

1.      The claimant was insured for a period of disability and disability insurance benefits on the October 2, 2012 alleged onset date, and she remains insured for these benefits through at least September 30, 2015. Tr. 134.

2.      The claimant has not engaged in disqualifying substantial gainful activity at any time since the October 2, 2012 alleged onset date.  Tr. 134.

3.      The claimant has had the following "severe" impairments since the October 2, 2012 alleged onset date: spinal disorders, obesity, asthma, an affective disorder, and an anxiety disorder.  Tr. 134.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

4.      Since the October 2, 2012 alleged onset date, the claimant has not had an impairment, or combination of impairments, that has met or medically equaled the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 135.

5.      Since the October 2, 2012 alleged onset date, and with the exception of possible briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521, 404.1545, 416.921 and 416.945 subject to the following limitations/restrictions: she can lift and/or carry up to 10 pounds frequently and up to 20 pounds occasionally; and she can stand and/or walk for six hours in an eight-hour period; and she can sit for six hours in an eight-hour period; and she can occasionally climb ramps, stairs, ladders, ropes and scaffolds; and she can occasionally balance, stoop, kneel, crouch, and crawl.  However, the claimant cannot work in environments where she would have concentrated exposure to fumes, odors, dust, gases, and/or poor ventilation.  The claimant can also perform tasks in jobs that are not subject to strict time or quantity demands so long as the jobs are located close to her home.  Tr. 139.

6.      Since the October 2, 2012 alleged onset date, the claimant has been able to perform her past relevant work as a registration clerk because this job would not require her to perform work-related activities precluded by her residual functional capacity.  Tr. 143.

7.      Although the undersigned has found above that the claimant has been capable of performing past relevant work since the October 2, 2012 alleged onset date, and is, therefore, not disabled at step four of the sequential evaluation process, there are other jobs existing in significant numbers in the economy that the claimant has been able to perform since October 2, 2012.  Therefore, the undersigned makes the following alternative findings for step five of the sequential evaluation process.  Tr. 144.

8.      The claimant has not been under a disability, as defined in the Social Security Act, at any time between the October 2, 2012 alleged onset date and the date of this decision.  Tr. 145.

## V. Parties' Arguments

Geraldi objects to the ALJ's decision on three grounds.  She argues that ALJ failed to follow the treating physician rule, failed to properly consider Geraldi's pain, and that she is entitled to a Sentence Six remand for consideration of new and material evidence.  Doc. 15, pp.

10-18.  In response, the Commissioner submits that the ALJ properly considered Geraldi's treating source opinion and complaints of pain, that his decision is supported by substantial evidence, and that Geraldi is not entitled to a Sentence Six remand.  Doc. 28, pp. 9-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### 1.  The ALJ did not violate the treating physician rule

Geraldi argues that the ALJ erred because he did not give controlling weight to Dr. Bshara's opinion and failed to give good reasons for the weight he gave.  Doc. 15, p. 12.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

16

reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered Dr. Bshara's opinion:

> In comparison [to the opinions of the state agency reviewing physicians], the undersigned gives lesser weight to the opinions of the claimant's primary care physician that are found in exhibit 8F.  Besides being inconsistent with the opinions of the State agency physicians who reviewed this record, this source's opinions that were not incorporated into the assigned physical residual functional capacity are not supported by the longitudinal record including the evidence referenced above.

Tr. 142.  The evidence that the ALJ referenced above included the following:

> First, and in regards to the claimant's physical functioning, the undersigned notes again that the claimant has been described on numerous occasions since the October 2, 2012 alleged onset date as being neurologically intact, and/or as having normal strength in her upper and lower extremities, and/or as having a normal gait (see, for example, Exs. 3F, p. 7; 5F, pps. 27, 31 and 34; 12F, p. 19; 14F, pps. 4 and 10; 16F, pps. 3 and 16).  There is also no persuasive evidence showing that the claimant has needed to use any assistant devices such as a cane or crutch or walker or wheelchair to assist with ambulation over any continuous 12-month period since October 2, 2012.  Significant pathology is also not seen in a magnetic resonance imaging scan of the claimant's lumbar spine that was taken on September 20, 2012 (see Ex. 4F, p. 30).  It was also noted on several occasions after October 2, 2012 that the claimant did not appear to be in any acute physical distress (see Exs. 3F, p. 1; 5F, p. 34; 6F, p. 8; 12F, pps. 4 and 8; 14F, p. 9; and 16F, p. 3).  The undersigned also notes again that the claimant also expressly denied having any gait problems on July 10, 2014 (see Ex. 16F, p. 14).  On this date, the claimant also denied having any problems walking, standing or sitting (see Ex. 16F, p. 13).  The undersigned has also considered the fact that the claimant's back problems have been treated conservatively since October 2, 2012.  The undersigned also notes here that the claimant has been able to smoke one pack of cigarettes a day[] since October 2, 2012 despite her asthma which has been described as being under good control (see Exs. 5F, p. 29; and 16F, p. 4; see also Ex. 12F, pps. 8 and 18).

Tr. 141.

Geraldi argues that the ALJ erred because he did "not mention the doctor, his findings or restrictions explicitly, nor does he identify any definitive evidence that contradicts the treating physician's opinion." Doc. 15, p. 12. The Court disagrees. The ALJ's failure to identify Dr. Bshara by name does not render his opinion faulty, nor does his failure to mention the restrictions set forth in Dr. Bshara's opinion. The ALJ accurately characterized Dr. Bshara as Geraldi's primary care physician and referenced Dr. Bshara's opinion as Exhibit 8F (Tr. 142); there is no requirement that he recite the doctor's name or the restrictions contained in his opinion. And the ALJ did identify "definitive" evidence that contradicted Dr. Bshara's opinion, as set forth above; namely, that Geraldi repeatedly was observed upon examination to have normal findings (intact sensation, muscle strength and gait) by Dr. Bshara and other providers, that her lumbar MRI findings were not significant, that the record shows that she denied having gait problems and problems walking, standing or sitting, that she had received conservative treatment, and that she was not compliant with treatment, i.e., she smoked a pack of cigarettes a day despite having asthma and that her asthma was nevertheless considered to be under control. Tr. 141. In short, the ALJ explained that Dr. Bshara's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the case record. *See Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2).

The ALJ's explanation also constituted good reasons for the weight he gave, i.e., that Dr. Bshara's opinion was inconsistent with and not supported by the record. *See* 20 C.F.R. § 416.927(c). Geraldi asserts that the ALJ "never considered that Dr. Bshara had been treating [her] for an extensive period of time, ordered objective testing upon which to base his opinion, and that there were other findings from Plaintiff's pain management and other treating physicians, that were in accord with Dr. Bshara's opinion." Doc. 15, p. 12. First, the ALJ is not

18

required to discuss every factor in 20 C.F.R. § 416.927(c).  *Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. March 16, 2011) ("Although the regulations instruct an ALJ to consider [the length, nature, and extent of the treatment relationship], they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis.").  Second, that Dr. Bshara is the physician that ordered objective testing upon which to base his decision is not compelling given that the ALJ remarked that the MRI results that Dr. Bshara ordered were not significant.  Tr. 141.

Finally, although Geraldi identifies evidence in the record that she believes supports Dr. Bshara's opinion (Doc. 15, p. 12), the standard is not whether there is substantial evidence to support Dr. Bshara's opinion but whether substantial evidence supports the ALJ's decision.  *See Wright*, 321 F.3d at 614.  And not all the records Geraldi cites are relevant to her argument.  *See, e.g.*, Tr. 500, 554 (treatment record of an epidural steroid injection); Tr. 428 (bone scan results showing mild degenerative change in her right knee and "an otherwise unremarkable bone scan"); Tr. 436 (Dr. Bshara's treatment note from October 14, 2012, showing "motor and sensory function, reflexes, gait and coordination are all intact"); Tr. 520 (hospital note stating, "The MRI from September was reviewed by pain management with [sic] they felt to be a normal lumbar spine with some minor bulging disk.").  To the extent the records Geraldi cites show she complained of pain, the ALJ found Geraldi's allegations not entirely credible (Tr. 140), as discussed more further below.  In sum, the ALJ's decision is supported by substantial evidence and is sufficiently specific to make clear to any subsequent reviewers the weight he gave to Dr. Bshara's opinion and the reasons for that weight.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–407 (6th Cir. 2009); Soc. Sec. Rul. 96–2p.

## 2.  The ALJ properly considered Geraldi's complaints of pain

Geraldi argues that the ALJ did not follow the proper legal standard when evaluating her pain.  Doc. 15, p. 13.  20 C.F.R. § 416.929(c) sets forth the standard for evaluating pain and the extent to which pain can reasonably be accepted as consistent with the objective medical evidence and other evidence.  When evaluating the intensity and persistence of pain, the ALJ considers all available evidence, including objective medical evidence obtained from clinical and laboratory diagnostic techniques (i.e., range of motion, sensory deficit); the claimant's daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications taken; treatment, other than medication, received; and any measures used to relieve pain.  *Id.*

Here, the ALJ considered Geraldi's allegations of pain but found her allegations not entirely credible because they were not substantiated by the objective medical evidence as well as the non-medical evidence in the record.  Tr. 140.  As explained above, the ALJ described the objective clinical findings showing normal extremity strength, a normal gait, and that Geraldi was neurologically intact.  Tr. 141.  She was not observed to be in any acute physical distress and denied having problems walking, standing, or sitting in July 2014.  Tr. 141.  She had received conservative treatment (Tr. 141) and did not have significant side effects from medication (Tr. 142).  Although Geraldi argues that Dr. Bshara opined that her severe pain interfered with her concentration (Doc. 15, p. 15), the ALJ noted that Geraldi was described as having good concentration abilities on numerous occasions (Tr. 142).  He observed that she has been able to carry out most activities of daily living.  Tr. 142.  *See* 20 C.F.R. § 416.929(c).

Geraldi also argues that evidence in the record shows that Dr. Koepke identified multiple tender points and diagnosed severe fibromyalgia and obesity.  Doc. 15, p. 15.  However, the ALJ considered Dr. Koepke's diagnosis of fibromyalgia (Tr. 135, explaining why he did not consider

20

her doctor's diagnosis of fibromyalgia as a medically determinable impairment) and Geraldi's obesity (Tr. 141, stating that Geraldi is obese and that the limitations in his RFC assessment take into account her obesity).

The ALJ properly considered Geraldi's pain and his decision must be affirmed. *Wright*, 321 F.3d at 614 (A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record); *Garner*, 745 F.2d at 387 (A court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility.").

### 3.  A Sentence Six remand is not warranted

Geraldi argues that the new evidence she submitted to the Appeals Council "directly addresses the underlying medical condition which causes [her] pain and the impact of her pain upon her functioning."  Doc. 15, pp. 15-16.  Thus, she argues, the Court should remand her case under Sentence Six of 42 U.S.C. § 405(g) for further administrative proceedings.  *Id.*

When an ALJ renders the final decision of the Commissioner, additional evidence submitted to the Appeals Council before or after the Appeals Council denies review should be considered only for the purpose of a Sentence Six remand.  *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).  A court may order a Sentence Six remand upon a showing by the moving party that (1) the additional evidence is both "new" and "material" and (2) there is "good cause" for failing to provide the evidence previously.  42 U.S.C. § 405(g); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 174 (6th Cir.1994)).  Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Foster v. Halter*, 279

F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).

Evidence is "material" if there is "a reasonable probability that the Secretary would have reached

a different disposition of the disability claim if presented with the new evidence." *Id.* (citing

*Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)).  "Good cause"

is a reasonable justification for the failure to acquire and present the evidence for inclusion in the

hearing before the ALJ.  *Id.* (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554

(1984)).

Geraldi identifies new evidence that she argues warrants remand: an October 2014 MRI

obtained two months after the hearing, medical records showing that her pain did not improve

with Percocet and Mobic, complaints of new neck pain, and continuing pain and numbness down

her left leg.  Doc. 15, pp. 16-17.  First, the records show that, although Mobic did not reduce

Geraldi's pain, Percocet did.  Tr. 9-10 (Geraldi reporting on October 9, 2014, that Percocet

reduced her pain level from a 10 to a 7); Tr. 54 (Geraldi reporting on November 6, 2014, that

Percocet reduced her pain from a 10 to an 8 but she did not feel it was helping enough).

Second, Geraldi asserts that she "developed neck pain on the right side of her spine" in

December 2014.  Doc. 15, pp. 8, 17.  That she developed pain in a new area of her body after the

ALJ's decision is not evidence establishing an impairment that existed prior to the ALJ's

decision.  Moreover, Geraldi reported on January 14, 2015, that her cervical pain had "rapidly

worsened;" this only serves to demonstrate that her severe neck pain is a new complaint that did

not exist during the time frame the ALJ considered.  "It is well established that a Sentence Six

remand is not appropriate to consider evidence that a claimant's condition worsened after the

administrative hearing."  *Walton v. Astrue*, 773 F. Supp.2d 742, 753 (N.D. Ohio Jan. 18, 2011)

(citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).  Finally,

Geraldi had a normal cervical x-ray on December 31, 2014, after her complaints of neck pain emerged; it is unlikely that her complaints of neck pain would have impacted the ALJ's decision given that the only diagnostic test relevant to her complaint of neck pain was normal.  The rule that evidence of a worsening condition after the hearing does not warrant a Sentence Six remain applies equally to Geraldi's reports in November and December 2014 that her condition had gradually worsened "over the last few months."  Tr. 77, 82.  If Geraldi's condition worsened after the administrative hearing, her appropriate remedy would be to file a new claim for benefits as of the date that her condition rose to the level of a disabling impairment.  *See Sizemore*, 865 F.2d at 712.

Third, the new evidence routinely showed normal physical examination findings, which Geraldi had consistently had before and which the ALJ commented on.  Tr. 141.  Thus, additional records showing normal objective examination findings would not have caused the ALJ to alter his decision to the benefit of Geraldi.

Finally, the MRI taken on October 27, 2014, showed an annular tear at L4-5 resulting in mild canal stenosis, severe left facet arthropathy, and moderate right facet arthropathy at L4-5; and multilevel spondylosis.  Tr. 18.  Geraldi asserts, "the new MRI is similar to the prior MRIs [taken in September and October 2012], but contains more extensive results, revealing more significant findings which provide a more clear explanation for the extent of Plaintiff's pain and limitations."  Doc. 15, p. 17.  However, like the 2014 MRI, both Geraldi's previous MRIs also showed only mild canal stenosis (Tr. 488, 532).  Although the 2014 MRI shows more significant arthropathy than the prior two MRIs at the L4-5 level, as well as multilevel spondylosis, Geraldi's neurosurgeon described the 2014 MRI results as grossly normal (Tr. 77) and she was not deemed to be a surgical candidate (Tr.  82).  And a lumbar x-ray taken in November 2013

showed that Geraldi had mild multilevel degenerative changes in the same area that the 2014 MRI did (Tr. 619, 2013 x-ray showing mild osteophytic lipping at the L2-3 level).  Thus, it cannot be said that the 2014 MRI results of multi-level degenerative changes were newly discovered in 2014.  Finally, as noted, Geraldi continued to have normal physical examination findings.

Moreover, Geraldi does not show "good cause" for her failure to produce this evidence in advance of the ALJ's decision.  "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement."  *Courter v. Comm'r of Soc. Sec.*, 479 Fed. App'x 713, 725 (6th Cir. 2012).  The Sixth Circuit "takes a harder line on the good cause test with respect to timing and thus requires that the claimant give a valid reason for his failure to obtain evidence prior to the hearing."  *Id.*, quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) (internal quotation marks omitted).  To show good cause a claimant is required to detail the obstacles that prevented her from entering the evidence in a timely manner.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

Geraldi states, by way of explanation, "the timing of the MRI and the updated reports were not within [her] control."  Doc. 15, p. 17.  She does not explain why this evidence was not within her control.  The Court notes that the record shows that Dr. Koepke referred her to an orthopedic doctor and stated that she likely need pain management in July 2013 (Tr. 618); throughout the following year he repeatedly indicated that she had not seen pain management or an orthopedic doctor, despite his urging (Tr. 615, 625); and she finally acted on Dr. Koepke's referral and saw pain management one year after Dr. Koepke indicated that she should consult pain management, in July 2014 (Tr. 719).  She first saw a neurosurgeon after the ALJ's decision, in November 2014.  Tr. 77.  Without further explanation, Geraldi's conclusory assertion that the

timing of the new evidence was not in her control does not establish "good cause" for her failure to obtain this evidence in advance of the ALJ's decision.

In sum, the evidence provided by Geraldi is not material because there is no reasonable probability that the ALJ would have reached a different conclusion if presented with the new evidence, *Foster*, 279 F.3d at 357, and she does not demonstrate "good cause" for not obtaining the evidence sooner, *Courter*, 479 Fed. App'x at 725.

### VII. Conclusion

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

Dated: December 5, 2016

Kathleen B. Burke
United States Magistrate Judge